AB:GN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for the Premises Known and Described as 3022 Brighton 8th Street, Apt. B1, Brooklyn, New York and Any Closed Containers/Items Contained Therein | **TO BE FILED UNDER SEAL**<br><br>**Affidavit in Support of Application for Search and Seizure Warrant**<br><br>No. 19-882M |

EASTERN DISTRICT OF NEW YORK) ss.:

BRYAN MULLADY, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1. I am a Detective with the New York City Police Department ("NYPD") and a Task Force Officer ("TFO") with the New York Drug Enforcement Task Force ("NYDETF") since 2017. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. As a Task Force Officer with the NYDETF, I have participated in numerous investigations related to the sale, possession, or trafficking of illegal narcotics, and have investigated money laundering relating to narcotics trafficking. During my career, I have participated in numerous executions of premises search warrants.

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence relating to the

investigation; my conversations with other law enforcement personnel; and my training and experience in investigating the sale, possession, or trafficking of illegal narcotics.

3. The information provided below is for the limited purpose of establishing probable cause for the requested warrant and does not set forth all of my knowledge about this matter. For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises described below and in Attachment A contains evidence, fruits, and instrumentalities of violations of federal criminal law, including violations of Title 21, United States Code, Sections 841 and 846 (distribution and possession with intent to distribute, and conspiracy with intent to distribute controlled substances) and Title 18, United States Code, Section 2 (aiding and abetting) (the "Subject Offenses").

4. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Premises**

5. The Subject Premises is particularly described as 3022 Brighton 8th Street, Apartment B1, Brooklyn, New York 11235 (the "Subject Premises"). The Subject Premises is an apartment on the ground floor of a three-story apartment building located at 3022 Brighton 8th Street, Brooklyn, New York 11235 (the "Subject Building"). The Subject Premises is located on the ground level of the building, and accessed through a white door marked "3022." The Subject Premises is the last apartment situated at the rear end of the hallway. The Subject Building and the entrance of the Subject Building is depicted in the following photograph:



6.      Based upon a review of law enforcement records and conversations with other law enforcement personnel, I learned that the Subject Premises is the primary residence of JUSTIN PORCELLINI. Based on my conversations with other law enforcement personnel, I learned that on or about September 26, 2019, NYPD patrol officers were in the Subject Building and spoke to PORCELLINI, who informed the patrol officers that he and his wife lived inside the Subject Premises.

C.  **Probable Cause For The Subject Offenses**

7.      Based on my personal observations, conversations with other law enforcement officers, and review of law enforcement reports, I have learned the following, in substance and in part:

a.      Approximately on and between March 29, 2019 and September 24, 2019, an undercover officer with the NYPD ("UC") met with PORCELLINI on eight separate occasions outside the Subject Building and made controlled purchases of illegal drugs in exchange for an agreed-upon amount of cash ("the Controlled Transactions").

3

  b. Each of the Controlled Transactions followed a similar pattern: before each buy, UC communicated with PORCELLINI on a particular cellphone number. UC and PORCELLINI arranged to meet outside of the Subject Building, and agreed upon the particular amount of drugs that UC would purchase and the cost of those narcotics. After communicating on the phone, UC and PORCELLINI met outside of the Subject Building, and UC purchased heroin from PORCELLINI. After each of the Controlled Transactions, UC passed the purchased drugs to other law enforcement officers, who sent the drugs to a forensic lab for testing. The lab tests confirmed that the drugs that UC purchased in each of the Controlled Transactions either contained heroin, or a combination of heroin and fentanyl and/or acetyl fentanyl. Each of the Controlled Transactions are detailed below:

  c. On or about March 29, 2019, UC called PORCELLINI and asked to purchase heroin. PORCELLINI told UC to meet him in front of the Subject Building. As directed, UC met PORCELLINI in front of the Subject Building, and PORCELLINI sold UC approximately 20 bundles of heroin in exchange for $1,300.00 in cash. Lab tests indicate that the heroin UC purchased from PORCELLINI contained heroin, fentanyl, and acetyl fentanyl.

  d. On or about May 15, 2019, UC called PORCELLINI again, and asked to buy heroin. UC met PORCELLINI outside of the Subject Building, and purchased approximately ten bundles of heroin from PORCELLINI in exchange for $650.00 in cash. Lab tests indicate that the heroin UC purchased from PORCELLINI contained heroin, fentanyl, and acetyl fentanyl.

  e. On or about June 4, 2019, after communicating with PORCELLINI by phone to buy heroin, UC met PORCELLINI in front of the Subject Building. During this encounter, PORCELLINI sold UC approximately twenty bundles of heroin in exchange for

4

$1,300.00 in cash. Lab tests confirmed that the heroin UC purchased from PORCELLINI contained heroin.

   f. On or about June 19, 2019, after calling PORCELLINI and asking to purchase heroin, UC met PORCELLINI in front of the Subject Building. During this encounter, PORCELLINI sold UC approximately ten bundles of heroin in exchange for $650.00 in cash. Lab tests indicate that the heroin UC purchased from PORCELLINI contained heroin, fentanyl, and acetyl fentanyl.

   g. On or about July 17, 2019, UC called PORCELLINI again and asked to purchase heroin. PORCELLINI told UC, in sum and substance, that he was not around but directed UC to meet PORCELLINI's wife at the Subject Building because "she will take care" of UC. UC traveled to the Subject Building, called PORCELLINI, and notified him that he had arrived at the agreed-upon location. PORCELLINI subsequently told UC that he would "call her and let her know." Shortly thereafter, UC saw a woman, who was later identified to be LOURDES VAZQUEZ, exit the door from the ground level of the Subject Building. VAZQUEZ approached UC and handed UC a cookie box and said, in sum and substance, that "the stuff is inside the box." UC looked inside the box and saw approximately two sleeves of heroin. Upon receipt of the drugs, UC paid VAZQUEZ approximately $1,300.00 in cash. Lab tests indicate that the heroin UC purchased from PORCELLINI contained heroin, fentanyl, and acetyl fentanyl.

   h. On or about August 7, 2019, UC called PORCELLINI to purchase heroin. UC traveled to the Subject Building and called PORCELLINI and told him UC was outside. PORCELLINI told UC that he "will be right out," and shortly thereafter, UC saw PORCELLINI exit the door from the ground level of the Subject Building. During this encounter, PORCELLINI

sold UC approximately one sleeve of heroin in exchange for $600.00 in cash.  Lab tests indicate that the heroin UC purchased from PORCELLINI contained heroin and fentanyl.

     i.  On or about August 16, 2019, UC called PORCELLINI again to purchase heroin.  UC traveled to the Subject Building as directed, and then called PORCELLINI and told him UC was outside.  Shortly thereafter, UC saw PORCELLINI exit the door from the ground level of the Subject Building.  During this encounter, PORCELLINI sold UC approximately one sleeve of heroin in exchange for $600.00 in cash.  Lab tests indicate that the heroin UC purchased from PORCELLINI contained heroin, fentanyl, and acetyl fentanyl.

     j.  On or about September 24, 2019, UC called PORCELLINI and again asked to purchase heroin.  PORCELLINI told UC to go to the Subject Building.  After UC called PORCELLINI and told him UC was outside, UC saw PORCELLINI exit the door from the ground level door of the Subject Building.  PORCELLINI met UC and the two walked to the corner of Brighton 8th Street and Ocean View Avenue, during which PORCELLINI sold UC approximately one sleeve of heroin in exchange for $600.00 in cash.   Lab tests indicate that the heroin UC purchased from PORCELLINI contained heroin and fentanyl.

  8.  Based on my training, experience, participation in other narcotics investigations, and discussions with other law enforcement officers experienced in narcotics investigations, I know that drug traffickers commonly use their residence or residences to receive and store narcotics and that their residences often serve as a base of operation for a narcotics trafficking organization.  As a result, the following items, among other things, which are frequently stored by narcotics traffickers in the course of their narcotics trafficking activities and which constitute evidence of narcotics trafficking, are likely to be found in the residences and stash houses of individuals who are engaged in narcotics trafficking:

k.Narcotics traffickers frequently find it necessary to store, outside the normal banking system, large sums of cash received from the sale and distribution of controlled substances.

l.Narcotics traffickers frequently maintain large amounts of cash and other valuable assets such as precious metals or gems on hand in order to maintain and finance their ongoing business.

m.Narcotics traffickers frequently keep firearms and ammunitions in their residences to protect narcotics and the proceeds of narcotics trafficking, and to protect themselves from rival dealers.

n.Narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other documents relating to the transportation, ordering, sale and distribution of controlled substances and maintain monetary instruments and other assets. Such documents and other items are generally maintained where the narcotics traffickers have ready access to them, such as at their residences or other locations where they regularly conduct their narcotics business.

o.It is common for significant narcotics traffickers to hide in secure locations within residences for ready access and conceal from law enforcement the following: proceeds of drug sales, records of drug transactions, weapons, ammunition, caches of drugs and other contraband, other items containing or reflecting evidence of the processing or counting of drug proceeds, including but not limited to money counting machines, large amounts of currency, financial instruments, keys for safe deposit boxes, precious metals, jewelry and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to

obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities.

p. When narcotics traffickers amass proceeds from the sale of controlled substances, they commonly attempt to legitimize these profits. Narcotics traffickers use various methods to achieve this goal, and evidence of these efforts includes but is not limited to records from foreign and domestic banks and their attendant services, credit card records, records from the purchase of securities and other financial instruments, cashiers checks, money drafts, letters of credit, records from brokerage houses, real estate records, and documents and records relating to shell corporations and business fronts.

q. Narcotics traffickers commonly maintain, in books and papers, names, addresses, telephone numbers and/or paging numbers for their criminal associates. They also often maintain telephone billing records that evidence the placing of large numbers of calls each month, consistent with narcotics dealing. They also maintain identification documents, including driver's licenses, passports and other travel documents, and social security cards.

r. Narcotics traffickers commonly have photographs of themselves, their associates, their property and their narcotics in their possession or in their residences or other locations where they regularly conduct their narcotics business.

s. Narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing controlled substances. These paraphernalia include but are not limited to scales, plastic and glassine bags and materials used in cooking powder cocaine into crack, such as baking soda, and other utensils and materials for packaging.

9. Based on my training, experience, participation in other investigations concerning narcotics trafficking, and extensive discussions with other law enforcement agents, I know that

individuals who traffic narcotics routinely secrete and store books, records, documents, currency and other items of the sort described in the preceding paragraph and in Attachment A, which is incorporated herein by reference, in secure locations like cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items. I therefore seek authorization to open any closed items and containers or to seize any such closed items and containers so that they may be opened if tools or other implements are required.

10. Based on the foregoing, I respectfully submit there is probable cause to believe that JUSTIN PORCELLINI and LOURDES VAZQUEZ committed the Subject Offenses, and that evidence, fruits, and instrumentalities of these criminal activities are likely to be found in the Subject Premises.

**II. Conclusion and Ancillary Provisions**

11. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

12. In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

*Detective Bryan Mullady*
Bryan Mullady
Detective, New York City Police Department
Task Force Officer, New York Drug Enforcement Task Force

Sworn to before me by telephone on
October 1, 2019

/s/ PK
UNITED STATES MAGISTRATE JUDGE PEGGY KUO
EASTERN DISTRICT OF NEW YORK

# ATTACHMENT A

## I. Premises to be Searched—Subject Premises

1. The Subject Premises is particularly described as 3022 Brighton 8th Street, Apartment B1, Brooklyn, New York 11235 (the "Subject Premises"). The Subject Premises is an apartment on the ground floor of a three-story apartment building located at 3022 Brighton 8th Street, Brooklyn, New York 11235 (the "Subject Building"). The Subject Premises is located on the ground level of the building, and accessed through a white door marked "3022." The Subject Premises is the last apartment situated at the rear end of the hallway. The Subject Building and the entrance of the Subject Building is depicted in the following photograph:



## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 (distribution and possession with intent to distribute, and conspiracy with intent to distribute controlled substances) (the "Subject Offenses") described as follows:

1. Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, and telephone directories.

2. Narcotics and controlled substances and all evidence of narcotics and controlled substances use, transportation, possession or distribution including records, papers, ledgers, tally sheets, digital display pagers, digital beepers, stored electronic communication devices, mobile telephones, electronic telephone and date books.

3. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

4. Papers, tickets, notes, receipts, and other items relating to domestic and international travel.

5. Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, payment receipts, mortgage receipts, mortgage payments, deeds, passbooks, money orders, cashier's checks, bank checks, safe deposit box keys, money wrappers, filed and non-filed income tax records, credit card receipts, credit card statements, minute books and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

6. Proceeds of drug trafficking, including United States currency, precious metals, jewelry, and financial instruments, including certificates of deposit and stocks and bonds.

7. Photographs, including still photos, slides, negatives, digital images, video tapes, films, undeveloped film and the contents therein, in particular photographs of associates, possible co-conspirators, assets, and/or controlled substances.

8. Address and/or telephone books, rolodex indices, and any pagers or cell phones that have the ability to store names, addresses, telephone numbers, pager numbers, fax numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a drug trafficking relationship exists.

9. Firearms and ammunition, including but not limited to, handguns, pistols, revolvers, and other weapons, as well as, any records or receipts pertaining to firearms and ammunition.

10. Documents and articles of personal property relating to the identity of the persons occupying, possessing, residing in, owning, frequenting or controlling the Subject Premises to be searched or property therein, including rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, answering machine tape recordings, cellular telephones, rolodexes, telephone answering pads, storage records, vehicle records, cancelled mail envelopes, correspondence, bank records, safety deposit box records, cancelled checks, and other records of income and expenditure, credit card and bank records, travel documents, and personal identification documents.

11. Records or documents pertaining to postal and private package delivery services, including air bills, receipts, containers, and packages.

12. Equipment to detect police activities and surveillance, including radio scanners and tape and wire transmitter detectors.

13. Photographs of individuals importing, possession, distributing or manufacturing controlled substances.